The Grolier Society Inc. v. Commissioner.
Grolier Soc'y Inc. v. Commissioner
Docket No. 35911.
United States Tax Court
1953 Tax Ct. Memo LEXIS 132; 12 T.C.M. (CCH) 1039; T.C.M. (RIA) 53304; August 31, 1953
Gordon W. McKean, Esq., 36 West 44th Street, New York, N. Y., for the petitioner. Clay C. Holmes, Esq., for the respondent. OPPER
Memorandum Findings of Fact and Opinion OPPER, Judge: Respondent determined a deficiency in excess profits tax against petitioner for the year 1944 in the amount of $113,947.95. The sole issue remaining in controversy is whether an amount based on the cost of answering future information service inquiries is properly deductible in 1944. Findings of Fact Some of the facts were stipulated and they are hereby found. Petitioner, a Delaware corporation with its principal office in New York City, filed its tax return for 1944 with the collector for the third district of New York. It kept its books on an accrual basis and reported its income on the installment basis. Petitioner *133 is engaged in the publication and sale of sets of books, most of which are of an encyclopedic nature. Sales are made through personal solicitation by sales representatives. Monthly installment payments are made over a term of months varying from 12 to 18 depending upon the amount of a sale. In the installment book publishing business it is customary to offer premiums such as dictionaries, atlases, globes and book-cases as sales inducements. From the time of its formation in 1936 until 1944 petitioner issued to each purchaser as a premium a certificate of membership in the Grolier Information Service. This certificate entitled the owner to submit inquiries at the rate of not more than one per month and to receive replies thereto from the Grolier Information Service for a period of ten years. In February 1944 petitioner changed its method with respect to sales after that date, so as to give each purchaser, instead of a membership certificate, 100 information coupons. Each coupon entitled the purchaser to an answer to one question submitted within a period of ten years. A coupon could not be redeemed for cash. It could only be redeemed for an answer to a question. Petitioner's liability *134 for supplying such answers was an actual, valid and binding contractual obligation arising under written contract. The coupons were registered and serial numbers assigned, keyed to indicate the year of sale and the publication with which sold, making it possible to validate the coupons at a later date and keep proper records indicating the year in which the sale originated and in which petitioner reported the sale in its income statements. With petitioner's consent, the coupons could be transferred to another subscriber who desired to take over the order. The Grolier Information Service is a separately maintained department of petitioner, devoted solely to the answering of inquiries received from holders of membership certificates and information coupons. Some answers are prepared by petitioner's staff and others are sent to outside specialists and editors on a free-lance basis. A highly technical question would be of much greater expense to petitioner than a comparatively simple question. The average cost of answering all types of inquiries during 1943 and 1944 was $2.15 and $2.21 per reply, respectively. Petitioner's salesmen usually called the attention of prospective purchasers *135 to the value of the information coupons and to the average cost of answers supplied by petitioner. At the time of its formation in 1936 petitioner established on its books an account, which it labeled a "reserve," to cover the cost of answering future inquiries from holders of Information Service certificates. Petitioner did not deduct on its income tax returns the original addition to this account. Instead it deducted the cost of answering inquiries each year as the inquiries came in. The "reserve" account was not adjusted in any way until 1945. In 1944 petitioner was still answering questions asked by people who had purchased books in prior years. On March 13, 1945, at the time consideration was being given to the closing of petitioner's books for 1944, Mr. F. P. Murphy, petitioner's president, hereinafter called "Murphy," wrote a memorandum to Mr. C. B. Wilcox, petitioner's chief accounting officer, hereinafter called "Wilcox," in which he stated: "* * * In the year 1944, we instituted a new system of providing coupons for information service to subscribers in place of the former more loose and less restricted system. Yet this process of giving a patron the privilege of turning *136 in a coupon or ticket has actually encouraged, rather than restricted, the use of the service. * * * "At any rate, there has been in the last twelve weeks a substantial acceleration in the use of the service. In February 1943 we had 1,175 users, and in February 1944 1,379, and the number jumped in February 1945 to 1,758. * * *
"Heretofore it has been possible to get a lot of this service rendered by freelance workers instead of staff members. The employment conditions now necessitate a rapidly increasing staff as the work mounts, and the staff must be professionally trained to handle the technical problems involved. As the Director of the Service so well points out, these and various other factors of rising costs will not abate with the cessation of the war. It is apparent that we have an increased obligation in 1945 for its approximate number of users of $10,750, for an average number of years I estimate at five, and believe our obligation incurred for this service should be expressed at the increased figure of $53,750.00 over and above whatever the reserve therefor was at the beginning of the year. In determining this, I have taken the lower cost figure * * * namely $2.15." *137 Wilcox made a further study to supplement the analysis made by Murphy. The total of $53,750 computed by Murphy was reduced by Wilcox to $48,300 upon the basis of the following figures: Information Service answers in the
previous year: No. answered in January
1944
1,041
No. answered in February
1944
1,379
2,420
Information Service answers this
year: No. answered in January
1945
1,461
No. answered in February
1945
1,751
3,212
Increase in the number of
inquiries required under
coupon system
792
Percentage of increase
32.72%
Total number of inquiries answered
in year 1944
13,730
Increase of 32.72% which rate has
been established in Jan. and Feb.
'45
4,492.46
Additional yearly cost at $2.15 per
inquiry
$ 9,658.79
Number of years for which inquiries
will be received - 10 years reduced
to give effect to the tapering off
after 5 years, the entire period con-
sidered as 5
$48,293.95
Accrual for additional liability as at
December 31, 1944
$48,300.00
In its 1944 tax return, petitioner deducted $48,300 as an expense of that year. The entire amount was disallowed by respondent. Subsequent to making the $48,300 computation *138 in 1945, Wilcox reviewed the method he used and employed a different method in making a revised computation, as follows: Number of eligible orders - 1944
76,161
The five years - 1940-1944 inclusive -
of number of answers supplied to
the number of eligible users
24.2%
Rate of increase in use of Information
Service during January and Febru-
ary 1945 over January and Febru-
ary 1944 as shown in previous
calculation
32.72%
Above increase expressed as a per-
centage of former five year average
7.9%
REVISED PERCENTAGE OF AN-
TICIPATED ANSWERS TO NUM-
BER OF ELIGIBLE ORDERS FOR
1944
32.1%
Number of answers for 1944 eligible
orders expected to be received over
entire five year period
24,448
Number of answers actually supplied
during 1944 on 1944 eligible orders
4,149
Balance of answers to be supplied in
ensuing four years
20,299
Computed at $2.31 per answer
$46,890.69
The information as to questions to be answered in January and February 1945 was not available on December 31, 1944. The average span of questions asked under the information coupon plan was approximately five years. Subsequent to the filing of its tax return, petitioner made *139 an exhaustive statistical study of the number of answers supplied by the Information Service for the purpose of determining what percentage of the 1943 and 1944 orders would result in the submission of inquiries during the subsequent ten-year periods. It was determined that 11.84 per cent of the eligible 1943 purchasers would send in requests for answers, of which 10.34 per cent would be submitted during the first five years following the issuance of the membership certificates; whereas 31.59 per cent of the eligible 1944 purchasers would send in coupons for redemption, of which 23.59 per cent would be submitted during the first five years following the issuance of the coupons. The types of questions received under the coupon plan were the same as those received under the membership certificates. The variation between technical and simple questions was the same in both instances. In addition to the $48,300 deducted in its 1944 tax return, petitioner also deducted the cost of answering inquiries already contracted for. Petitioner did not apply to respondent for permission to change its method of accounting. The $48,300 appeared on petitioner's books under expense rather than as *140 a debit to the reserve account. In subsequent years, nothing was charged against the $48,300. The costs of answers supplied in 1945 in redemption of 1944 coupons were also charged to expense. Such costs were not charged against the $48,300 because, under petitioner's method of accounting, the reserve account was reappraised and adjusted at the end of 1945 to reflect the reserve then needed to cover the remaining liability for outstanding coupons and membership certificates. It was not feasible for petitioner to determine whether any particular cost of answering inquiries was a proper charge against the reserve. Petitioner did not file with its 1944 return the information required by Regulations 111, section 29.42-5. The amount set up ostensibly as a "reserve" for answering future questions is not deductible in the year 1944. Opinion Petitioner's change to a system of coupon redemption for answering inquiries directed to its Information Service might perhaps have qualified under the section of respondent's regulations dealing with "Subtraction for Redemption of Trading Stamps". [1] The difficulty is that so far as the record shows petitioner made no effort to comply with the *141 conditions imposed by that section of the regulations. It did not file with its return the information to which apparently respondent would resort in checking the correctness of the "subtraction," nor did it make any effort to do so. *142 "* * * Plaintiff's income tax returns for the years in question, without any data being furnished from which to ascertain the percentage of purchase slips that would eventually be presented for redemption, fixed an arbitrary percentage * * * and thus refused to give the Commissioner any basis for determining the amount proper to be allowed as a deduction. Certainly a taxpayer cannot be permitted to pursue such a course, completely ignoring and disregarding a proper and lawful regulation. Deductions are matters of legislative grace and it is only when the clear provisions of the statutes have been followed that any particular deduction can be allowed. Shapleigh Hardware Company v. United States, 8 Cir., 81 Fed. (2d) 697 * * *. [United States v. O. J. Morrison Stores of Fairmont, ( C.A. 4) 99 Fed. (2d) 77, 79]" Failure to comply with the regulations is perhaps an assumption. But petitioner's tax returns, to which the necessary schedules should have been attached, were not introduced in evidence. And since the burden lay on petitioner, and proof as to the necessary prerequisite is lacking, we are driven to the same conclusion as was reached in the Morrison *143 case. Nor is the deduction permissible as the addition to a reserve for future payments. Petitioner had for some eight years been operating an Information Service with similar requirements for the cost of transmitting answers to inquiries. Charges for this service were deducted from year to year as they arose and no reserve account for income tax purposes had ever been established. Under those circumstances we see no escape from the conclusion that if petitioner proposed to adopt a reserve method for charging future costs of inquiries contracted for in connection with current business, it was radically changing its bookkeeping method. For this, permission of respondent was required and such accompanying adjustments as would be necessary to make the new system consistent with the old should have been made. St. Paul Union Depot Co. v. Commissioner, (C.A. 8) 123 Fed. (2d) 235; Estate of L. W. Mallory, 44 B.T.A. 249, Acq. 1941-2 C.B. 8, 9; Jerome R. George, 27 B.T.A. 765; The Clendening Co., 1 B.T.A. 622. No such change was requested and no such permission granted. [2] And that this is no mere formality seems to us evident *144 from the fact that in the year in issue petitioner both deducted actual costs of answering inquiries resulting from current business, and also attempted to establish its purported reserve for future expense. Such a method would tend to facilitate double deductions in future years, but whether or not this actually occurred, respondent's opportunity to foreclose the possibility was rendered more difficult by petitioner's failure to request the requisite permission. We conclude that neither as a redemption fund for "trading stamps" nor as a properly constituted reserve has petitioner shown that it complied with the necessary conditions to avail *145 itself of the contested deduction. Decision will be entered under Rule 50. Footnotes
1. Reg. 111, Sec. 29.42-5. SUBTRACTION FOR REDEMPTION OF TRADING STAMPS. - If a taxpayer, for the purpose of promoting his business, issues with sales trading stamps or premium coupons redeemable in merchandise or cash, he should in computing the income from such sales subtract only the amount which will be required for the redemption of such part of the total issue of trading stamps or premium coupons issued during the taxable year as will eventually be presented for redemption. This amount will be determined in the light of the experience of the taxpayer in his particular business and of other users of trading stamps or premium coupons engaged in similar businesses. The taxpayer shall file for each of the five preceding years, or such number of these years as stamps or coupons have been issued by him, a statement showing - (a) The total issue of stamps during each year; (b) The total stamps redeemed in each year; and (c) The rate, in percentage, which the stamps redeemed in each year bear to the total stamps issued in such year, regardless of the year when such redeemed stamps were issued. A similar statement shall also be presented showing the experience of other users of stamps or coupons whose experience is relied upon by the taxpayer to determine the amount to be subtracted from the proceeds of sales. The Commissioner will examine the basis used in each return, and in any case in which the amount subtracted in respect of such stamps or coupons is found to be excessive, appropriate adjustment will be made.↩
2. There is not here that acceptance of returns prepared on a different theory which has in some cases been held to constitute a tacit consent by respondent. Cf. Fowler Bros. & Cox v. Commissioner, (C.A. 6) 138 Fed. (2d) 774; S. Rossin & Sons v. Commissioner, (C.A. 2) 113 Fed (2d) 652; Ganahl Lumber Co., 21 B.T.A. 118↩. The year in question was the first one in which the deduction of the so-called reserve was attempted, and it is precisely respondent's disapproval which formulates the present issue.